UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.

Civ. No. 17–49.

United States District Court, D. New Jersey.

Sept. 3, 1981.

William W. Robertson, U. S. Atty., Newark, N. J. by John L. Wilson, Gregory B. Hovendon, James P. Denvir, III, Bernard M. Hollander, Sp. Attys., Antitrust Div., and John E. Ingle, Larry A. Blosser, James K. Smith, Sp. Attys., Federal Communications Commission, Washington, D. C., for the U. S.

Pitney, Hardin & Kipp by S. Joseph Fortunato, Morristown, N. J., and Harold S. Levy, Associate Gen. Counsel, New York City, Howard J. Trienens, V. P. and Gen. Counsel AT&T, New York City, for defendants.

## OPINION

BIUNNO, District Judge.

This matter comes on by motion of defendants, Western Electric Company, Inc. and American Telephone and Telegraph Company, as a post-judgment motion in this cause, Civil Action No. 17–49. The complaint was filed by the United States on January 14, 1949 as a civil anti-trust suit alleging violation of sections 1, 2 and 3 of the Sherman Act.

An answer was filed in the style authorized by Rule 8(b), F.R.Civ.P. that is, by setting out what defendants alleged to be a correct statement of the facts pleaded in the complaint, and denying the remainder. The main answer effectively denied the anti-trust allegations. By way of separate defense, the defendants pleaded the bar of res judicata. That defense was grounded on a civil anti-trust suit (a petition in equity) filed May 13, 1930 in the U.S. District Court for the District of Delaware, which was amended and supplemented on March 7, 1932, naming the defendants here, as well as others as party defendants. That suit is said to have involved certain patent license agreements with a number of radio manufacturing companies, and it is alleged that after the license agreements were revised or replaced to the satisfaction of the Attorney General, a supplemental answer pleading them was filed, and the case was disposed of by an order of dismissal as to the defendants here and entry of a consent decree as to other defendants, on November 21, 1932. It further alleged that on July 31, 1942 the United States filed a motion in the Delaware suit to vacate the earlier dispositions and instead to dismiss the suit without

prejudice. That motion was denied, see 46 F.Supp. 654 (D.Del., 1942).

There was no testimony taken in the 1949 suit here, and no adjudication of any issue of fact or law made. Rather, the case was closed by the entry of a final judgment by consent, reciting that it was not to constitute any evidence or admission by any party as to any issue in the case.

That final judgment was signed January 24, 1956 by the late Thomas F. Meaney, U.S. District Judge.

The present motion is filed under the provisions of Section XVII of the judgment, the first sentence of which says that:

> "Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the *construction* or carrying out of this Final Judgment, or the modification or termination of any of the provisions thereof or for the enforcement of compliance therewith or for the punishment of violations thereof." (Emphasis added)

This provision to retain jurisdiction for the indicated purposes makes it unnecessary to engage in a review of the applicable law in respect to proceedings to construe a judgment, and particularly a permanent injunction, whether in the cause or by independent suit, or as a collateral issue in a suit involving other parties. For a case where another tribunal was called upon to construe certain provisions of the 1956 judgment here, see *Southwire Co. v. U.S. Intern. Trade Com'n.*, 629 F.2d 1332 (CCPP, 1980). See, also Rule 60, F.R.Civ.P. For a case where the judgment court entertained and ruled on a motion for construction (with no mention of an express provision to retain jurisdiction) see *New Jersey v. New York*, 296 U.S. 259, 56 S.Ct. 188, 80 L.Ed. 214 (1935). A case illustrative of the bringing of an independent action in the same court where the judgment was entered, but not in the same cause, is *National-Ben Franklin, etc. v. Camden Trust Co.*, 21 N.J. 16, 120 A.2d 754 (1956).

That it is prudent to secure construction, especially when there is a disagreement, is exemplified by *State ex rel. Jarboe v. Holt*, 444 S.W.2d 857 (Mo., 1969) (en banc), and *Lucky Calendar v. Cohen*, 19 N.J. 399, 117 A.2d 487 (1955) and 20 N.J. 160, 119 A.2d 14 (1955).

The retained jurisdiction has been invoked before in this case, though not between the plaintiff and defendants. The most recent instance was a motion by an applicant for a license under Section X of the judgment (dealing with a judgment structure for the mandatory licensing of patents) to have the court establish interim rates, terms and conditions, and thereafter to establish reasonable royalties and other terms for the license desired. The patents involved had reference to the circuitry of devices known as "modems" which perform various functions such as modulation/demodulation, scrambling/descrambling, and automatic equalization, which functions are performed in order to transmit high-speed digital pulses from and to computers or computer terminals over the communications network successfully and with means for error detection and correction.

No claim has been raised that the court lacks jurisdiction to entertain the motion or to construe the judgment. Rather, the plaintiff and most of those who filed submissions *amicus* have taken the position that the motion is in fact one to modify the judgment rather than to construe it. The court sees this issue as a collateral one and not a matter of substance.

The motion, as framed, seeks construction of the judgment and advances a particular construction. If the court concludes that the meaning advanced is correct, its ruling will be both a construction and an approval of the particular meaning advanced. On the other hand, if the court concludes that the meaning advanced is incorrect, it will nonetheless be construing the judgment. If that should be the outcome, at least two courses of action will exist. One, the FCC may need to revise its new regulatory structure to conform to whatever meaning is ascertained, and, two, defendants could ask

the court to modify the judgment to accommodate the FCC's new regulatory structure.

In order to test the question whether the point was merely a matter of procedure, the court asked the United States to consider the question whether it would oppose modification to accommodate the FCC's new regulatory scheme, and it has made clear in the post-argument briefs that it would oppose such modification. It is of some significance, too, that the United States has not filed a cross-motion for modification of the judgment to embody the meaning advanced by it in the event the court should conclude that the meaning advanced by defendants is correct.

Given this pattern of postures and positions, it is clear that on the present motion the court has before it only the task of construing the judgment as it is, a task which is independent of the tenor of the meaning found.

The occasion which gives rise to the motion is a disagreement between two units of the United States. The FCC, after lengthy

and complex hearings called Computer Inquiry I and Computer Inquiry II, concluded that its regulatory mandate and the public interest would be served best if a category of equipment labelled "customer premises equipment" (CPE), and a category of service labelled "enhanced service" (ES), be regulated in a new and different format than the underlying transmission "pipeline", labelled "basic services." [1]

There is no dispute that this is the conclusion reached by the FCC. The disagreement arises from the fact that FCC believes that the provisions of the 1956 judgment do not stand in the way of compliance by AT&T with the directions of its order. The United States, through the Department of Justice, and in particular its Anti-Trust Division, is of the view that the 1956 judgment stands in the way, and that if AT&T complies with the FCC order, it will violate the 1956 judgment.[2]

The defendants, then, are in a position of peril if they merely comply, or fail to com-

---

**1.** The task of identifying what items or categories fall in the class of "basic service", and what fall into the class of "enhanced service" is a task for the FCC, and the boundary will doubtless change with time and technology. At one time, calling a disconnected number merely told the caller that, and a separate effort was needed to find the new number. Today, when a number has been changed, an automatic intercept with a tape recorded message provides the new number.

If there is no one to answer a called number, the subscriber today has the option of installing a device to answer and record the message. These devices can be obtained from either the telephone company or on the open market. Tomorrow, technology may make it feasible to have this function performed at the central office at lower cost.

Call forwarding can be achieved today with a device provided by the customer, though he will require two lines, and is also achieved in the newest electronic central offices.

Thus, the line between the two kinds of service is bound to change with time, but the court makes no attempt to draw that line either today or for the future. It does note that the definitions of wire and radio communications, 47 U.S.C. § 153(a) and (b), include, among other things, "the receipt, forwarding and delivery of communications".

**2.** This is not a case like *Cantor v. Detroit Edison*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) in a number of important respects. The private anti-trust suit there was aimed at a lamp bulb replacement program authorized by tariff filed by the utility with the regulatory agency, and was not the kind of provision necessary to make the regulatory statute function. Here, the order reflects policy decisions arrived at by FCC and imposed upon the regulated carrier so that the regulatory statute can function.

Also, *Cantor* involved a State regulatory agency, and hence State law, which is inevitably subordinate to the Sherman Act, a federal law, under the Supremacy Clause.

Finally, the 1956 judgment effectively draws in the Communications Act of 1934, as amended, with no suggestion of any intent to confine or restrict the FCC in making policy or entering orders which it regards as necessary to make the Communications Act work.

Thus, if the question were open for consideration on the motion, which the court does not believe it is, a more relevant decision would be *Gordon v. N.Y. Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

*Cantor*, incidentally, reversed a trial court grant of summary judgment, 392 F.Supp. 1110, which was affirmed on appeal, 513 F.2d 630, but there is no reported decision to indicate what occurred after remand.

ply, with the FCC order. Hence the present motion.

The background of the two extensive inquiries that led to the FCC ruling is enormously complex, and while the court has carefully reviewed the *Tentative Decision*, 72 FCC2d 358 (1979), the *Final Decision*, 77 FCC2d 384 (1980), and the *Reconsideration Decision*, 84 FCC2d 50 (1980), a detailed discussion of them is not needed to decide this motion, although a brief historical review is essential to an understanding of the issue.

The decision of the FCC itself is on direct review elsewhere, sub. nom. *Computer and Communications Industry Ass'n, et al v. FCC*, U.S. Court of Appeals for the District of Columbia, No. 80–1471 and others. In that review, no doubt, questions involving the statutory authority of the FCC to make the order, as well as the factual and policy support for it, and other like questions, will be raised and decided. None of those questions or any questions like them are before this court on the present motion. The court here necessarily accepts the order as it is and proceeds to consider whether the 1956 judgment stands in the way of its implementation. No decision is intended or made on any issue on direct review in the District of Columbia.

Two separate historical streams lead to a confluence giving rise to the FCC decision. One has to do with technological developments and activity. The other has to do with recent regulatory action taken by the FCC.

The technology history was briefly outlined by the court at the argument of the motion, with the request that the parties indicate whether they had any objection to its being considered as context. There was no objection. By later memorandum, the court asked the parties if they wished to adduce any further facts to be made part of the record here. None did. The court also authorized those allowed to make submissions *amicus* to prepare factual summaries of their particular fields of activity, to be submitted to the parties as though furnished under Rule 36, F.R.Civ.P., so that they could be considered as facts not in dispute for the purposes of the motion only, thus barring their use for any other purpose or their use against a party in any other proceeding, see Rule 36, last sentence. Many such submissions were made and filed. The United States agreed to the arrangement, but defendants did not.

Despite the lack of agreement to this suggested mechanism, the court is satisfied that the *factual* materials so submitted (ignoring matters of argument with which one or another may be interlaced) are sufficiently reliable to warrant their consideration for context only. In addition, much of the history has been adequately recorded in reference sources of reasonably indisputable accuracy such as to warrant taking judicial notice of the path technology has taken. The major facets that are pertinent can be found in any good encyclopaedia or other reference work.

Before the telephone, the only successful mode of communication by wire was through the telegraph, which dates to Morse's invention of 1837. Long-distance communication by wire and radio dates to 1905, with Marconi's invention of the radio telegraph. When the telephone came along in 1876, the telegraph was fairly well advanced. Chain transmission by the use of the repeater telegraph already had achieved long distance linkages, and Edison's quadruplex system of 1873 had already provided enlarged capacity to send simultaneous signals over the same wires.

However, what had been achieved for telegraph was not a technology usable for telephone. This is because the electrical signals each used were of an entirely different nature. The signals of the telegraph were pulses of current—dots and dashes with spaces between. The signals of a telephone were fluctuating levels of current on a continuous basis, superimposed upon the steady level provided by the battery. Both sending devices converted mechanical action into electrical currents, and both receiving devices converted the electrical currents back into mechanical action, but there the resemblance ended. The telegraph's

mechanical action was the closing or opening of a key, and the same was true of the sounder. In the telephone, the mechanical action consisted of vibrations in air pressure induced by the human voice at the sending end, and the induced vibration of a diaphragm to reproduce those air vibrations at the receiving end so that they could be heard. About all that was common between the two was that both made use of wire circuits and a battery to connect the sending and receiving devices or "terminal equipment," and the underlying idea of converting some kind of mechanical action into electrical signals that could be conveyed over a wire circuit. There was a further difference: the telegraph required the use of a code for the dots-and-dashes. The telephone, when used for voice communication, required no code.

It took some time before means to extend the telephone communication link were discovered. The first was Pupin's invention of the "loading coil" in 1900. The next was DeForest's invention of the triode, which could amplify the kind of fluctuating signal used in telephone. DeForest's invention was the basis for the audio amplifier, used as a "repeater" as the repeating telegraph had been, to make voice transmission by wire possible from coast to coast. It also became the basis for radio broadcasting, and eventually TV. Since then, of course, except for picture tubes in cameras and receiving sets, and for high power applications, the transistor and its progeny of solid-state devices replaced the vacuum tube for most purposes.

Another branch of development deals with the difference between communication by wire and radio on the one hand, and radio "broadcasting" on the other. This branch deals with what might be thought of as isolation or privacy of a communication. The network for wire and radio communication is like a first class letter: only the writer and addressee have access to the content of the communication. For radio broadcasting, the analogy is to whatever is printed in a newspaper. The message is sent out willy-nilly, so to speak, and can be received by anyone and everyone tuned to the station at the time of the broadcast and within the range of its signals. Thus, the wire/radio communications network must have a system for connecting a calling instrument to a called instrument so that the two parties may communicate privately over the connecting link. This branch was dealt with by switching systems, manual at the start and now automatic.

If every instrument were to be connected by direct wire/radio link to every other instrument, the combinations and permutations would be astronomically high and the cost of plant and equipment would put the service beyond reach. By using a series of switching systems at hierarchal levels, accessibility to all instruments is achieved with a far smaller number of wire/radio channels. The local exchange connects instruments in a geographic area where the largest number of calls arise. The exchange in a toll office provides links for the smaller number of calls from one local exchange to another. And other switching centers pick up the traffic and provide links for the still smaller volume of calls between more distant locations. A caller in New York who phones Oahu once a year does not need his own wire to span that distance available 365 days a year. He only needs the use of an available channel when he places the call. If he should call on Mother's Day, or on Christmas Eve, or Easter Sunday, he may need to wait a bit for the lines to be free. If he calls while the annual Superbowl game is on, his call will doubtless go straight through.

These sketchy fundamentals are mentioned as context because otherwise one might think that the "basic service" that the FCC speaks of is a simple matter of dialling a number and making a connection. This would be misleading because the magnitude and complexity of providing "basic service" are enormous in size and complexity.

Another branch of the context has to do with the "computer", whose wide proliferation gave rise to the several complex FCC inquiries. The modern computer dates to

World War II, though its beginnings are attributed to the use of punched cards by Herman Hollerith to tabulate the data compiled by the 1890 census. Hollerith, in turn, got his idea from the Jacquard loom of 1800, who himself had extended principles and systems going back to Hero of Alexander in the second century B.C. See, for example, the discussion in James Burke's "Connections" (Little, Brown & Co., 1978), at pp. 106–113.

The modern "computer" began as a device placed at a specific location, where tasks were taken to it to perform. In a rapid evolution of considerable complexity, the tasks were "sent" to the computer from remote terminals over the communications network, and its output was communicated in the same way to the terminal. Today, the terminals themselves are equipped with various kinds of computer capability and communicate with each other over the same network.

Within the communications network itself, and as part of the "basic services" defined by FCC, computer devices have been installed and employed for the more efficient and effective operation of the network and to render various services that could not otherwise be offered, thus providing the benefits of new inventions and developments. These devices are used not only for the process of transmission of signals over the network, but also for essential functions needed for accounting and record keeping of operations.[3]

Thus, the wire/radio communications network today has come to the point of being able to transmit both oral or voice communications, which are "analog", and telegraph or computer communications, which are pulses or "digital", involving one or another code. It is this coming together of different systems into a communications network able to handle both, an essential to the effective use of both, that has blurred earlier lines of distinction in the view of the FCC.

The stream of regulatory events is also pertinent. In a series of decisions starting with *Carterfone*, 13 FCC2d 420, *recon. den.* 14 FCC2d 571 (1968) and culminating with *Terminal Equipment Registration*, 58 FCC2d 736 (1975), the historical and traditional arrangement under which no piece of terminal equipment could be connected by a customer directly to the communications network was replaced by an entirely different one. Under the present structure, a subscriber entitled to use the network is free to acquire whatever terminal equipment desired, whether it be as simple and basic as a standard telephone handset or as complex and intricate as a computer, from any manufacturer he chooses and to connect it to the network so that it can be used for communication. This system is regulated by the FCC in that the piece of equipment must be tested and evaluated, and certified as compatible with the network, and then registered.[4]

**3.** As the hearings on the 1980 motion in respect to patent licenses made clear, the entire network used to provide "basic service" must be equipped with all manner of complex and sophisticated automatic devices in order to achieve reliable transmission of the communication from and to both ends of the link. These are far beyond the repeater amplifier developed in the early days merely to achieve long distance voice transmission. That they are sophisticated does not mean they are more than "basic." The term "basic" is obviously a term of evolutionary meaning, intended to encompass whatever state the art has achieved. It already means more today than a pair of wires, a battery, some switches and a "ringer".

**4.** The regulations governing the connection of terminal equipment which has been certified and registered are set out in Part 68 of 47 C.F.R. Inspection of them, including the Appendix, will disclose the high degree of technical engineering design, manufacture and operation involved. The Commission staff no doubt has the requisite expertise for dealing with the subject effectively.

Some idea of the complexity of dealing with terminal equipment and its interrelationship with the communications network can be obtained by inspection of reference works such as "Communication System Engineering Handbook", edited by Donald H. Hamsher (McGraw-Hill, 1967), especially Chapter 2 on "User Equipments and Services"; Chapter 6 on "Transmission Engineering of Switched Systems"; Chapter 10 on "Multiplexing"; Chapter 12 on "Data-Transmission Equipment" and

The coming together of these two historical streams, one from technology and the other from regulation, led the FCC to arrive at the decision giving rise to the disagreement which calls upon this court to construe the 1956 judgment in order to learn whether that judgment stands in the way of implementing the FCC regulatory arrangement.

What the FCC order does, so far as pertinent to this case, is to direct that terminal equipment, including the ordinary telephone, be removed from the charges made by common carriers for "basic service", and that the customer be left free to decide whether to obtain his terminal equipment from the telephone company that serves him or from some independent source. It is the finding of FCC that there has developed and now exists an active and intensely competitive market for terminal equipment. This court does not go behind that finding.[5]

Since telephone companies have always included the plant and service cost of terminal equipment in the single charge for access to the communications network, this change is not intended to reduce market competition for terminals by barring common carriers from participating. Their participation and continued competition was intended.

What was done, in the case of AT & T, was to require the creation of a "fully separated subsidiary" (FSS) as a vehicle for offering to the public, in competition with others, the terminal equipment and enhanced services.

Chapter 15 on "High-Frequency Communications Circuits".

No doubt current technology is considerably more advanced than when this reference work was published in 1967, but the complexity involved even then is quite obvious.

5. There is one particular provision in the 1956 judgment which has doubtless been of considerable assistance to the FCC, over the years, and which will no doubt support its regulatory activities under the new format. That provision is Section IX, which provides that:

"Western is ordered and directed to maintain cost accounting methods that conform with such accounting principles as may be generally accepted and that afford a valid basis,

FCC regards the technique as a different format for regulating AT&T in these respects, in substitution for the traditional and classic method of "tariffs". Through its authority to regulate AT&T, FCC has set up regulatory controls over the formation and operation of the FSS. Major items are:

...there must be separate officers from those of any AT&T communicating carrier;

...the FSS must do its own marketing at its own expense;

...for the equipment and services it provides, the FSS must have its own personnel;

...AT&T may not advertise or engage in the promotion or sale of the offerings of the FSS;

...enhanced services offered by the FSS may not use shared computer capacity of an AT&T communications carrier;

...there must be physical separation of physical space requirements from places where transmission or facilities equipment for basic services is located;

...the FSS must develop or acquire its own software;

...FSS earnings may not be imputed to AT&T tariffed activities or alter its revenue requirements;

...the FSS may not own any transmission facilities; its access to the network is to be on the same terms as for all others;

...capitalization of the FSS, as well as accounting methods, are to be reported to FCC and subject to its approval.[6]

taking into account the magnitude and complexity of the manufacturing operations involved, for determining the cost to Western of equipment sold to AT&T and Bell Operating Companies for use by them in furnishing common carrier communications services."

6. The FCC is quite familiar with the concept of separations, as are the State regulatory agencies. Since a good deal of the same plant and equipment (terminals, customer loops, central offices) is used for both intra-state communications regulated by State commissions and for interstate communications regulated by the FCC, it is essential that property costs, revenues, expenses, taxes and reserves must be

■ There are other controls as well, all of them adding up to a newly designed format for regulation of CPE and ES activities by AT&T's new FSS. As a matter of judgment and for the time being, subject to later change, this regulatory format is not now to be applied to any carrier other than AT&T. Thus, this regulatory format is structured to function on the basis of a combination of specific regulatory restraints and of market forces. There is at least one instance in which it has been ruled that the FCC is authorized to rely on the action of market forces among its array of regulatory tools. See *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981). Thus, it cannot be said, as a matter of law, that FCC reliance on market forces implies lack of regulation.

The position of the United States is grounded on the proposition that it is only an exception to the injunction of Section V of the 1956 judgment that allows AT&T to engage in the business of "furnishing common carrier communications services", and that this term is defined by Section II(i) to mean communications services and facilities, "the charges for which are subject to public regulation under the Communications Act of 1934."

From these two phrases, primarily, it argues that unless tariffs are actually filed to specify the dollar amount for the sale or rental of a telephone handset or a Datas-

peed 40/4 (a video terminal with some computer capabilities not unlike the many makes now available for "word processing", see 62 FCC2d 21 and 570 F.2d at 455), the injunction bars their offer.

While tariffs of that kind have long been used in public utility regulation, they are but one of the tools of public regulation. The argument is therefore one of semantics and is not supported by either the language or the obvious intent of the judgment, read from its four corners and aided by the pleadings and surrounding circumstances.[7]

■ Most significant of all is the fact that, as a judgment in a civil anti-trust suit, none of the language can be regarded as in any way confining or limiting or restricting the mandate, authority or discretion of the FCC, or the manner of its exercise.

The key regulatory expressions in the 1934 Act are not the tariff mechanism, but other provisions. Thus, 47 U.S.C. § 201(b) declares that "all charges . . . shall be just and reasonable. . ." and the last sentence of that section authorizes rules and regulations as may be necessary in the public interest to carry out the provisions of the Act. The statute does not purport to instruct FCC on *how* to do so, or *what* the rules and regulations are to say. By this provision alone, the "charges" are "subject to public regulation" under the Act.

Another section, 47 U.S.C. § 202(a) makes it unlawful for any carrier to make

---

allocated to each jurisdictional branch of service. This separation process is needed so that each regulatory body, State or federal, will have the underlying figures entering into determinations of revenue requirements and rate of return.

The rules by which this is done are published in a "separations manual" developed by FCC together with the State regulatory agencies. See Part 67, "Jurisdictional Separations", in 47 C.F.R.

The rules for establishing and operating the new fully separated subsidiary are obviously designed to simplify what would otherwise be an extremely complex and possibly intractable "separations" process under existing methods.

7. While most tariffs list the dollar amount of a one-time or recurring charge, there are others for which no dollar amount is or can be given. Samples of these have been provided, and as

one example there are tariffs saying that the customer is to pay the "cost" of underground installation of wires. These charges, which will vary from case to case, are just as subject to regulation under the 1934 Act as those specifying a dollar amount.

This being the case, the objection of the United States could easily be met if FCC were to require the new subsidiary to file tariffs listing the models of terminal equipment and the kinds of enhanced services being offered, with the entry: "Going retail market price, but not less than cost", or some such formula. That would be a tariff. Or, if the new subsidiary decided to offer its equipment through independent wholesale outlets or retail stores, then so long as there were no exclusive territories or control of resale prices, a tariff could be filed saying: "Going wholesale market price, but not less than cost."

any unjust or unreasonable discrimination in "charges". This provision, too, subjects the charges to public regulation under the Act. .

Even in the usual case where a charge is tariffed, the tariff is but a step in the process of regulation. Under 47 U.S.C. § 204, FCC may on its own initiative suspend a proposed new charge, conduct hearings and decide what the charge should be. The fact that a charge may be already in force does not bar FCC, on its own initiative, to investigate and determine the just and reasonable charge, which may be a minimum, a maximum, or both, under 47 U.S.C. § 205.

■ In short, the FCC has plenary jurisdiction over charges, which it may look into either on complaint or on its own initiative. This jurisdiction, of course, is a primary jurisdiction to exercise what amounts to continuing surveillance. This is not a matter of deference as such but rather a matter of separation of powers. The Congress has placed in the FCC, an administrative agency in the Executive Branch, the function of public regulation of charges for common carriers in communications.

If the argument of the United States is intended to imply that FCC's decision to rely in part on competitive market forces as one of its regulatory tools to assure that charges are just and reasonable, is outside FCC's statutory authority, that question is not before this court and can be raised only in the ongoing proceeding for direct review in the District of Columbia.

■ The language of the judgment is clear and unambiguous, and it seems to the court beyond dispute that AT & T, in complying with the FCC order, will be engaging in the business of furnishing communications services and facilities, the charges for which are subject to public regulation under the Communications Act of 1934, as amended. The judgment here does not stand in the way of implementing the order.

A reading of the final judgment from its four corners, in the context of the issues raised by the pleadings, discloses that the terms and provisions negotiated and developed were prospective and looking to the future. Although some of the provisions are expressed in the form of enjoining and restraining, and others in the form of ordering and directing, various exclusions and exceptions have the effect of leaving the subject activities unaffected by the judgment.[8]

For example, Section IV(A) enjoins and restrains each defendant from "manufacturing" for sale or lease "any equipment which is of a type not sold or leased or intended to be sold or leased to Companies of the Bell System, for use in furnishing common carrier communications services, except equipment used in the manufacture or installation of equipment which is of a type so sold or leased or intended to be so sold or leased . . ." [Note: Excluded from this injunction altogether are three other categories: 1. the artificial larynx; 2. by-products of the reclamation of scrap; 3. equipment manufactured for the United States or for its contractors or sub-contractors for the performing of their contracts with the United States].

As another example, Section IV(B) enjoins and restrains defendant Western from engaging in any "business" which is not of a character or type engaged in by Western or its subsidiaries for Companies of the Bell System, other than

"(1) businesses in which defendant AT&T may engage under Section V hereof,

"(2) businesses in which Western is required to engage under this Final Judgment, and

"(3) any business engaged in for the plaintiff or any agency thereof".

That there is a difference between (A) and (B) of Section IV is evident from the difference between "manufacturing", IV(A), and "engaging in any business", IV(B) on its face and in light of the pleadings. Thus, par. 9 of the Answer discloses that the functions of Western include activities beyond manufacturing. It participates

---

**8.** Appendix A to this ruling sets out an analysis of the 1956 judgment in considerable detail.

in development and design of new and improved equipment. It performs R & D work on manufacturing processes, methods and facilities. It buys equipment not manufactured by it and makes technical and engineering inspections. It stocks equipment in storehouses to serve the operating units. In the case of central office equipment (whether manufactured by it or others) it prepares complete engineering specifications and performs the installations. It accepts returned equipment and either repairs or otherwise disposes of it.

It is beyond question that Section IV is prospective and forward looking not only in the sense that any injunction is, but in its content as well. This is evident from Appendix C to the Answer, which identifies Western's larger manufacturing plants and their products as at the time the Answer was filed. In the case of central office switching equipment, it lists only panel, step-by-step and crossbar. In the case of electrical or conductor links in the communication network, it lists exchange area cable, copper line wire, steel wire and strand, local cable, rubber covered wire, toll cable including coaxial, switchboard wire and cable, enameled wire and factory cable for dial switching systems.

If Section IV were intended to exclude from the injunctive language only those articles "manufactured", or only those "businesses" engaged in as of the date the judgment was entered, it would have frozen the permitted items of manufacture and the permitted businesses to those of early 1956. Such a construction would bar the manufacture of electronic switching system (ESS) central offices, and the manufacture of optical fiber (both of which reflect newer technology) and would also bar Western from engaging in the non-manufacturing functions as to these two examples. Such a construction would do violence to the underlying focus of the suit itself and the ensuing boundaries of the judgment. If such a freeze had been intended it would have been easy to insert the word "now."

The focus of the suit and the boundaries of the judgment are confined to the scope of the Sherman Act, which has nothing to say about the devices, mechanisms, systems or activities by which networks for the communication of information are designed, built and operated.

That function is vested by the Congress in the Federal Communications Commission (FCC) by the much later Communications Act of 1934. The goal that the FCC is to achieve is

"to make available, *so far as possible*, to all the people of the United States a rapid, efficient, nationwide, and worldwide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication..." 47 U.S.C. § 151, emphasis added.

The phrase "so far as possible" expresses the intent that available and feasible new technology be applied in achieving the mandated goal.

The definitions for "wire" and "radio" communication in 47 U.S.C. § 153(a) and (b) are very broad. They include the transmission of "writing, signs, signals, pictures, and sounds of all kinds" for the content, and "all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission," for the means. For a more recent and modern definition of "writing" and "recording" alone, see Fed.Ev.Rule 1001.

By 47 U.S.C. § 218, the FCC "shall" keep itself informed as to the manner and method in which the business of all carriers subject to the Act is conducted, and as to technical developments and improvements in wire and radio communication *"to the end that the benefit of new inventions and developments may be made available to the people of the United States"*. (Emphasis added)

By 47 U.S.C. § 214, the FCC is authorized, after full hearing, in a proceeding on its own initiative, to require by order any carrier which is a party to provide itself with

adequate facilities for the expeditious and efficient performance of its service as a common carrier, if it finds that the provision of facilities ordered is reasonably required in the interest of public convenience and necessity.

■ Read together, along with the rest of the 1934 Act, these particular provisions disclose a Congressional intent and a federal policy that the FCC maintain a broad expertise and perform supervisory functions at a policy level to assure that the communications network not become obsolete or antiquated in the face of evolutionary changes in the volume and nature of the needs, subject to the limitation that the expense involved be so phased as not to impair the carrier's ability to perform its duty to the public.

Nothing in the pleadings or in the judgment even remotely suggests any intention that the FCC be subjected to any confinement or restraint in carrying out its mandate by reason of the provisions of the judgment.

So far as the regulatory history is concerned, it is fully set out in the brief amicus of the FCC, with extensive citations too numerous to embody here. By separate order, the Clerk will be directed to file that brief as part of the record. The same is true of the brief amicus filed by Mr. Henry Geller, who was Assistant Secretary of Commerce for Communications and Information, and also Administrator of the National Telecommunications and Information Administration (NTIA) during the period when important changes were made in respect to terminal equipment, and when the two Computer Inquiries were under way.

Others have submitted briefs amicus and filed summaries or thumbnail sketches of particular industry segments. These are part of the record.

By and large, their position is that to construe the judgment as defendants urge would be to subject them to competition from defendants and that the very size of defendants would overwhelm them.

These arguments are misdirected. The motion for construction does not open up the judgment for a trial of the issues raised by the complaint and answer. Also, those now in a position to manufacture, sell or lease terminal equipment to telephone company subscribers for direct connection to the network were no doubt aided by the FCC program of certification and registration of terminal equipment. That ruling did not open up the field for them alone, free of competition from telephone companies. The telephone companies have continued to compete and will continue to compete. The only difference is in the format for CPE and ES, not in the existence of competition. Their objections may be aimed at the proceeding for direct review but have no impact on the narrow question here. Nor can the court express any view, even if it had one and authority to express it, on the question whether the FCC's new regulatory format for CPE and ES is a good one or a bad one, or whether it will work better or not than some other format.

It must be made clear that the interplay between intensively regulated and unregulated businesses is extremely complex. Even fairly simple devices are not easy to label or classify, in and of themselves. Labels and classifications often depend on how the device is used.

For example, an ordinary telephone handset not wired up to the communications network is probably of very little use. It may be used as a child's toy, to play with the dial. The handset can be used as a simple hammer. The whole device can be used as a paperweight, or to provide a decorative base for a lamp. Once wired up properly, with necessary voltages applied, it can be used as an interoffice telephone or a network telephone. Wired up it becomes an integral segment of a system of communications.

The now common smoke alarm is another good example. It usually contains a device to detect smoke, in which case a switch is closed so that an internal battery will operate an alarm. But if it be wired up to the communications network to signal the near-

est fire house, it becomes a terminal for a communications system by wire/radio. If a telephone company were to offer communicating smoke alarms (or burglar alarms) to its subscribers, this would be the kind of activity that the 1956 judgment permits, even though a non-communicating alarm might not be.

No ruling is intended by these examples. They are mentioned only to illustrate the complexities of questions that can arise in regard to particular items.

Devices such as automatic diallers, telephone message machines, and a host of other devices now on the market since the certification and registration program was adopted tend to be devices that have no use except as adjuncts to the network.

■ In any event, the ruling here in respect to construction of the 1956 judgment does not purport to deal with or decide such questions, nor does the court believe they can be raised properly within the scope of the retained jurisdiction provision unless one of the parties moves for modification, either to prohibit an activity the judgment allows, or to allow an activity the judgment forbids.

Note should be made too, that in ruling on the question that is presented, the court has kept in mind the strictures of Rule 65(d), that every injunction is to be specific in terms, and is to describe in reasonable detail the act or acts sought to be restrained and not by reference to the complaint or other documents. It is for that reason that decisions such as *U. S. v. ITT Continental Baking Co.*, 420 U.S. 223, 233, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975) are not directly applicable. In that case there was an administrative, rather than a judicial, consent order, to which there were attached various documents which the consent order itself provided could be looked to. This is essentially an integration device rather than an incorporation by reference. There is no such provision or attachment in this case except for Scnedule A to the judgment, naming the 22 "Bell Operating Companies" defined in Section II(c).

The conclusion arrived at makes it unnecessary to take up the alternative proposition that, in any event, Section V(g) allows:

> "business or services incidental to the furnishing by AT&T or such subsidiaries of common carrier communications services."

Whatever else "incidental" may mean in the context of a grant of authority or exclusion from a prohibition, it does not always mean something one can do without, as in the old reminder of the importance of small things:

> "For the want of a nail the shoe was lost,
> For the want of a shoe the horse was lost,
> For the want of a horse the rider was lost,
> For the want of a rider the battle was lost,
> For the want of a battle the kingdom was lost—
> And all for the want of a horseshoe nail."
>
> BENJAMIN FRANKLIN, *Poor Richard,* 1758, from *Stevenson,* "Home Book of Quotations" (Dodd, Mead & Co., 1947) 5th Ed., p. 2041.

Submit an order promptly in accordance with this opinion.

## APPENDIX A

The operative terms of the judgment fall into both prohibitory and mandatory injunctions. A brief review of these, other than introductory parts, is instructive.

Section IV(A) prohibits "the defendants" from *manufacturing for sale or lease* "any equipment which is of a type not sold or leased or intended to be sold or leased to Companies of the Bell System for use in furnishing common carrier communications services..."

Excluded from this prohibition are four classes of manufacture for sale or lease:

> ... equipment used in manufacture or installation of equipment which is of a type so sold or leased, or intended to be sold or leased;
>
> ... the artificial larynx;
>
> ... by-products of the reclamation of scrap;
>
> ... equipment manufactured for the United States (or its prime or subcontractors);

Section IV(B) prohibits "Western" from *engaging in any business* "not of a character or type engaged in by Western or its subsidiaries for Companies of the Bell System".

Excluded from this prohibition are three classes of business:

... businesses that AT&T may engage in under Section V;

... businesses in which Western is *required* to engage "under this Final Judgment";

... any business engaged in for the United States or any agency thereof.

Section IV(C) is not pertinent to the present motion. It only requires that a sale of a subsidiary or assets made necessary by Section IV need not be made on other than at a fair price and reasonable terms, and requires that no such sale be made except to a person approved by this Court.

Section V forbids "A.T. & T", either directly, or indirectly through its subsidiaries "other than Western and Western's subsidiaries" from *engaging in any business* other than the furnishing of common carrier communications services.

Excluded from this prohibition are seven categories of business.

... furnishing services or facilities for the United States or any agency thereof.

... experiments for the purpose of testing or developing new common carrier communications services.

... furnishing circuits to other communications common carriers.

... leasing and maintaining to persons who are lessees from "defendants" or subsidiaries 45 days after the date of the judgment, facilities for private communications systems, the charges for which are not subject to public regulation. This exclusion was for a period of five years and has now expired.

... directory advertising.

... advice or assistance to other communications common carriers.

... businesses or services incidental to the furnishing by AT & T or its subsidiaries (other than Western and Western's subsidiaries) of common carrier communications services.

Section VI forbids "the defendants" from *making or performing any contract or agreement* with a person whereby either defendant (or subsidiaries) will have any right in any territory to act as distributor of any equipment manufactured or sold by such person.

It also forbids *making or performing any contract or agreement* with a person whereby such person will have any exclusive right in any territory to act as distributor of any equipment manufactured or sold by either defendant (or subsidiaries).

Excluded from this prohibition are categories of activity:

... buying any equipment for sale, lease or supply to the defendants' associated companies.

... buying any equipment for sale, lease or supply to the United States.

... distribution, by Westrex and its subsidiaries to sound recording studios or (to anyone) outside the United States.

... disposition in any channels of trade of any equipment originally acquired for sale to defendants' associated companies or to the United States.

Section VII forbids "the defendants" from *making, performing or enforcing, any contract or agreement* with any independent telephone operating company under which such company is required to buy any equipment from them. This does not apply to any specific purchase order or to any specific contract for the purchase of operating plant.

It also forbids *making, performing or enforcing any agreement or contract* with any purchaser to limit, fix or control the prices to be charged by such purchaser on the resale of any equipment.

Section VIII forbids "the defendants" from *acquiring any person* engaged in the manufacture, distribution or sale of equipment useful in furnishing common carrier communications services, either by acquisition of securities or of assets.

Excluded from this prohibition are three categories of activity:

... acquisition of all or part of the securities of subsidiaries of either defendant.

... formation of subsidiaries by either defendant and the transfer thereto of assets of either defendant or of other subsidiaries of either defendant.

... acquisition of a person otherwise forbidden on grant of permission by this Court, on application and notice to the United States, which permission may be granted on a showing that the effect of the acquisition will not be substantially to lessen competition or to tend to create a monopoly.

Section IX is a mandatory injunction commanding Western to maintain cost accounting methods that conform with such accounting principles as are generally accepted and that afford a valid basis, taking into account the magnitude and complexity of the manufacturing operations involved, for determining the cost to Western of equipment sold to AT&T and Bell Operating Companies for use by them in furnishing common carrier communications services.

Sections X and XI contain both mandatory and prohibitory injunctions in connection with a required system for the mandatory non-exclusive license under all claims of any, some, or all existing and future Bell System patents (except as to patents of Teletypesetter Corporation). Subject to exception for some narrow categories, the licensee is obliged to pay reasonable royalties. If the parties cannot agree, interim and final royalty rates are to be set by this Court on motion. The provisions are highly detailed and complex and appear to have no application to the present motion. In the course of hearing on a motion of this nature during 1980, it appeared to the Court that some of the details were prepared to avoid applicable law as it stood before *Lear v. Adkins*, 395 U.S. 653 (1969), and the suggestion was made that the provisions ought to be re-examined for possible revision to provide the added protection to a licensee arising from that decision, but the matter was closed before any application for that purpose was made by any party.

Section XII forbids "the defendants" from *acquiring title to any patent* owned or controlled by anyone other than the Companies of the Bell System and their employees.

There are two exceptions to this prohibition:

... By order of this Court, on application of either defendant on notice to the United States, where it is found that rights under the patent cannot be obtained otherwise than by acquiring title, or that the only terms on which a non-exclusive license can be obtained are unreasonable.

... Patents on inventions made by others pursuant to any research and development contract with any Company of the Bell System.

Section XIII forbids AT & T from *receiving* from Western *any payment of patent royalty* on any manufacture, lease or sale of equipment by Western to the Bell Operating Companies (which do not include the Long Lines segment of A T & T).

Section XIV contains both mandatory and prohibitory injunctions to supplement the provisions on mandatory licensing of patents. The main subject dealt with is the providing of technical information (e.g., manufacturing drawings and specifications of materials and parts and the assembly, wiring and acceptance test requirements) to persons obtaining patent licenses under Section X (except that the providing of information is limited to U.S. domiciliaries not controlled by foreign interests).

The providing of the information may be conditioned on payment of a reasonable and non-discriminatory charge, and on a requirement to be supplied with the licensee's technical information of like character and scope on payment to it of a reasonable charge. Other conditions and restrictions than those spelled out may be included if approved by this Court on application by either defendant on notice to the United States.

The obligation to furnish technical information is subject to restrictions imposed by any department or agency of the United States for reasons of national security.

If there be disagreement in respect to the amount of the charges for technical information, it is to be resolved by order of this Court, on motion, in the same manner as patent royalties for licenses requested under Section X.

Section XV forbids "the defendants" from making arrangements with others to divide fields of manufacture, sale or distribution, or that makes a patent license exclusive, or allows a licensee to sue for infringement of the licensee's patent, or from imposing maximum quantity or dollar limitations, or restricts sales to designated customers (with exceptions) or restricts sale prices of licensed equipment.

Section XVI is a mandatory injunction provision to allow access to authorized representatives of the Department of Justice, on written request of the Attorney General or the Assistant Attorney General of the Antitrust Division, to inspect books and records, interview officers and employees, and provide written reports on request, all for the purpose of securing compliance with the judgment.

No information so obtained is to be divulged except in legal proceedings to secure compliance with the judgment, to which the United States is a party, or as otherwise required by law.

Section XVII deals with retention of jurisdiction (in addition to proceedings that may be brought in the cause as under Sections VII, X and XIV) for general purposes such as for orders and directions as may be necessary or appropriate for the construction or carrying out of the judgment, or the modification or termination of any of its provisions, or to enforce compliance, or to punish violations.

After this general reservation there is a provision that on an application by the United States it shall be deemed to have made a sufficient showing of a change of circumstances warranting appropriate modification, "if it shall show elimination hereafter, in a substantial number of states, of public regulation of charges for common carrier communications charges".

The final reservation of jurisdiction is for the purpose of allowing the United States to apply to this Court at any time and without the need to show any change in circumstances, for any one or more of three kinds of orders:

(a) requiring sales of any *telephone equipment* manufactured by Western or its subsidiaries to independent telephone operating companies at non-discriminatory prices [NOTE: that such an order would require Western to engage in that business and is thus within the scope of Section IV(B)(2)]; or prohibiting or limiting sales of such equipment to such customers;

(b) requiring that any equipment manufactured by Western or its subsidiaries that is used by A T & T or any Bell Operating Company in furnishing a common carrier communication service, *other than telephone equipment*, shall be sold at non-discriminatory prices to any person lawfully engaged in furnishing such a service in competition with them, or in furnishing "message telegram" service, for use by such person in furnishing such service; [NOTE: this may be another IV(B)(2) item].

(c) requiring that A T & T shall, and shall cause its subsidiaries to, continue to lease, to common carriers engaged in the "message telegram" business, on reasonable terms, circuits required by them for use in their business, to the extent that such circuits shall be reasonably available without further construction.

## APPENDIX B

Persons allowed to file submissions amicus.

John E. Ingle, James K. Smith and Larry A. Blosser, Washington, D. C., for FEDERAL COMMUNICATIONS COMMISSION

Henry Geller, Washington, D. C., pro se

Donald A. Robinson, Newark, N. J., for AMERICAN NEWSPAPER PUBLISHERS ASS'N

John J. Francis, Jr., Shanley & Fisher, Newark, N. J., N. Frank Wiggins and Edwin B. Spievack, Cohn & Marks, Washington, D. C., for NORTH AMERICAN TELEPHONE ASS'N

Andrew J. Berry, McCarter & English, Newark, N. J., for TELEPROMPTER CORPORATION, and for NATIONAL CABLE TELEVISION ASSOCIATION, INC.; Jay E. Ricks, Steven A. Levy and Daniel R. White, Hogan & Hartson, Washington, D. C., of counsel

Murry D. Brochin, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N. J., for MCI TELECOMMUNICATIONS CORP.

Jeffrey J. Greenbaum, Sills, Beck, Cummis, Radin & Tischman, Newark, N. J., for SOUTHERN PACIFIC COMMUNICATIONS COMPANY; Reboul MacMurray Hewitt, Maynard & Krystol, Los Angeles, Cal., of counsel

Nicholas W. McClear, Wilentz, Goldman & Spitzer, Woodbridge, N. J., for ASSOCIATION OF DATA PROCESSORS SERVICE ORGANIZATIONS, INC., and for INDEPENDENT DATA COMMUNICATIONS MANUFACTURERS ASSOCIATION, INC.; Herbert E. Marks and Joseph P. Markoski, Wilkinson, Cragun & Barker, Washington, D. C., of counsel

Ralph N. DelDeo, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for GENERAL TELEPHONE & ELECTRONICS CO.; Gerald Sobel and Stanley D. Robinson, Kaye, Scholer, Fierman, Hays & Handler, New York City, George E. Shertzer, C. Daniel Ward and Dean C. Rohrer, Stamford

J. Barry Cocoziello, Podvey & Sachs, Newark, N. J., for MOTOROLA, INC., James M. Johnstone, Washington, D. C., Kirkland & Ellis, Washington, D. C., of counsel

Susan I. Littman, New York City, for UNITED STATES TELEPHONE & TELEGRAPH CORP., Grant S. Lewis, LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel

Howard M. Davis, Sobel & Lyon, Florham Park, N. J., for ALARM INDUSTRY TELECOMMUNICATIONS COMMITTEE OF THE NATIONAL BURGLAR & FIRE ALARM ASSOCIATION, and for COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; Bernard M. Beerman, Baker & Hostetler, Washington, D. C., and John Haven Chapman, of counsel.

Michael W. Spirito, Jr., pro se

Robert P. Bigelow, Bigelow & Saltzberg, Woburn, Mass., pro se

## APPENDIX C

### EXCERPTS FROM HEARING OF APRIL 13, 1981.

THE COURT: United States of America versus Western Electric, et al, Civil 17–49. This is a motion by defendants for an order construing the final judgment dated January 24, 1956. * * *

THE COURT: This motion comes on as the result of a decision by the Federal Communications Commission, which among other things, calls for the establishment of what is referred to as a fully separated subsidiary to supply on the open market, number one, customer provided equipment, and, two, enhanced services.

There is a disagreement between the parties on the question whether the 1956 judgment does or does not forbid that which the FCC decision calls for.

The FCC has filed papers asking leave to appear on the motion. For the purpose of today's proceedings, the FCC will be allowed to appear as amicus curiae to the extent of answering questions that may arise, but not to argue merits. * * *

A number of others have filed papers seeking leave to intervene as parties or to appear amicus curiae. The Court has directed the Clerk to accept all such papers up to today without regard to compliance with the general rules of this District establishing time limits.

Representatives of those applicants have been asked to fill out a registration sheet so that there will be a written record of their appearance without consuming hearing time or occupying needless space in the stenographic record.

The registration sheets will be filed and the appearances noted thereon will be made of record. Anyone who has not filled out a registration sheet will, of course, be allowed an opportunity to do so during recess of these proceedings.

Those applications by others are ordered to be decided without oral argument under Rule 78. The Court will attempt to make its ruling before the end of the day. If unable to do so, the applicants will be notified of the ruling at an early date.

In the event they are allowed to participate in the motion in any capacity, they should be prepared to make their written submissions on the merits of the motion on or before April 27th, 1981.

It may be, as the argument on the motion develops, that the Court may find a need to be supplied with one or another fact not in genuine dispute within the knowledge of one or another applicant. In that event, no matter what the ruling may be on the applications for leave, the Court will look to the applicants involved to supply the facts within their knowledge by certification under 28 United States Code in lieu of affidavit.

The certifications are to be submitted to the plaintiff and then to the defendants, who, if they can agree, are to file them with the Clerk with their stipulation that the fact certified may be taken as not in genuine dispute for the purposes of this motion, with the same effect as though those facts had been obtained by request for admissions under Rule 36 of the Rules of Civil Procedure.

In a conference discussion by phone late in March, the Court informed Mr. Wilson and Mr. Fortunato that it had been engaged continuously since January 19th of this year in the trial of criminal cases before juries as required by the Speedy Trial Act, and that other trials had been set to the end of May.

In the absence of an unexpected break in this schedule, the Court informed them that it might not be able to do more today than note appearances and set schedules, especially since this is a regular motion day with other matters listed.

Toward the end of last week, the Court, in another conference discussion, informed Mr. Wilson and Mr. Fortunato that the case on trial had unexpectedly ended, that the Court had reviewed the papers so far submitted, and that the parties should prepare to address the merits of the motion today.

The plaintiff's written argument on the motion was received on April 10th. Later that day, in another conference discussion with Mr. Wilson and with one of the house counsel for defendants, the latter reported that he was calendared to appear this morning before the Court of Appeals for the Second Circuit, and that he would arrive here as soon as possible after that matter had been heard.

As the Court presently understands the pending motion, it is not called upon to decide any issue involved in the suit filed in 1974 in the District Court for the District of Columbia, and which the Court understands is now at or about the trial stage. Nor does the Court understand that it has before it any question involved in judicial review of the FCC decision which gives rise to this motion, which review it understands will be had in the District of Columbia. The parties should address these understandings in their argument.

The record in this case contains no evidence or facts. The 1956 judgment itself recites that at its entry, no testimony had been taken and that there had been no trial or adjudication of any issue of fact or law.

Accordingly, to provide some factual context, the Court proposes to set down for the record a brief outline of the historical background. It believes these items come within the scope of judicial notice under Federal Evidence Rule 201, as matters capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

However, the Court prefers to summarize these matters and then put the question to the parties whether any of them is in genuine dispute for the purposes of this motion. The expertise of the FCC may be a useful aid in this regard.

Aside from smoke signals, wig-wag signal flags, fog horns, megaphones, bugles, trumpets, carrier pigeons and the like, the first system for the communication of signals over any significant distance was the telegraph. That invention is attributed to Samuel F. B. Morse in 1837. It is of some interest to note that it was a digital transmission system although not binary. Short pulses were dots and long pulses were dashes, while short spaces separated the dots and dashes of a given letter or number or character, and longer spaces separated the groups of signals for each character from each other.

Two transducer devices were used. The transmitter converted the mechanical movement of the telegraph key into pulses of electric current and spaces between them that formed the structure of the code. At the receiving end an electromagnet and armature transduced these pulses and spaces into mechanical movement which formed the sounds and clicks composing the code.

The transmission was over wire with a battery to provide the electrical energy. The restrictions of Ohm's Law being what they are, there were limits to the distance over which the signals could be transmitted reliably.

To increase the distance, the repeater telegraph was devised. This system simply used the armature of one receiver to also serve as the sending key for the next circuit. In this way a series of circuits could be strung together or linked in a chain so that a signal at one end could be sent along each link of that chain.

To increase the capacity of such systems to carry more than one signal at a time, and in both directions, improvements were invented such as the quadruplex telegraph of Thomas A. Edison in 1873.

The telephone did not come along until 1876, 39 years after the invention of Morse's telegraph. It used wires and a battery just as the telegraph did, but the transducers were different and the signal was different. The transducer at the sending end was a transmitter whose electrical resistance varied with the mechanical vibrations of the sound of the human voice. The transducer at the receiving end was an electromagnet, but the armature was a thin metal disc that vibrated with the flow of electrical current, thus causing mechanical vibrations to impinge on the eardrum.

The signal, instead of being spaced digital pulses of current consisted of fluctuations above and below the level of the direct current of the battery, thus forming what is recognized as audio frequency alternating current, superimposed on direct current.

This invention converted fluctuating mechanical movement into alternating electrical current and then back into fluctuating mechanical movement. The difference was in the nature of it. Where the telegraph could only transmit the dots and dashes of an artificial code for language, the telephone converted human voice sounds into electrical vibrations and back into reconstructed human voice sounds. It automatically encoded and decoded. Neither the speaker nor the listener needed to know either the Morse code or any other code to use the instrument itself.

Oddly enough, truly long distance communication, that is, by radio from antenna to antenna, came after the telephone, but was invented for telegraph. That was the radio telegraph of Marconi in 1895. Even though the repeating telegraph had long been known and could transmit over long distances through a chain of circuits, that system did not work for telephone. Transducers capable of receiving and repeating the voice signal simply did not exist then. It was not until 1900 when Michael I. Pupin invented the loading coil that the first method for increasing the distance of transmission became possible, but even this was only a partial answer. It was not until Lee DeForest's invention of the vacuum triode or amplifier tube in about 1906, that it became possible to install repeater amplifiers able to carry voice signals from coast to coast. The radio telephone, which matched the radio telegraph, did not come along until about 1915.

After that, new systems and devices came along much more quickly. Radar, which later became the basis for microwave transmission, was invented in 1922. The basic invention of TV dates to 1925, as does phototelegraphy, later known as facsimile transmission.

The teletypesetter is 1928. The first operating coaxial cable was in 1946. Microwave transmission began in 1947. The transistor came along in 1948. The laser came along in 1958.

During this period of development in electrical and electronic technology, photography was making its own headway. Daguerre's work dates to 1839. Talbott's invention of the negative was in 1841. George Eastman's amateur snapshot camera and system was in 1884. The Reverend Hannibal Goodwin invented flexible transparent film in Newark, New Jersey in 1887.

Goodwin's flexible film led to the silent movie, but the combination of that invention with Edison's phonograph of 1877 was not achieved until 1926 when the synchronized sound movie was invented.

The photo electric cell had been around since 1895, and so TV picture and sound was achieved even earlier than the talkie, but not on a commercially feasible level. That was not to happen until the development of the cathode ray tube, the picture tube, just before World War II.

This brief review of the highlights of the history illustrates the constant flow, interaction and cross-fertilization that has constantly blended and combined advances from separate fields. Today, using the technology of electronic communications, equipment is available for consumers to make TV movies which they can show on their own TV screens. They can make tapes of one program while watching another or even while not at home. The new video disc has just been marketed. All of this is in full color with synchronized sound and some systems even provide stereo sound.

Another parallel development is the computer. At first this machine could only be used where it was. Then it became possible to hook up remote terminals to communicate with the computer. More recently with the mini computer and the micro processer, what used to be the terminal is now itself a computer that can function where it is and also can communicate with similar terminals elsewhere and with a central computer where needed.

The developments along these lines are of an unusual nature, because as it has turned out, the language that computers use is digital like the telegraph, but in a different code. The communications network now made up of a mix of wire circuits, coaxial cable, microwave links and transmission of signals up to satellites and back must be able to accommodate the entire array of signals and the pattern is constantly changing.

The historical background from a legal standpoint seems to be that initially intrastate activity was regulated by the states or their subdivisions, while interstate activities were subject to regulation by the Interstate Commerce Commission.

A vestige of the 1888 statute on telegraphs is still on the books as 47 United States Code Section 9. It requires federally subsidized railroads to maintain and operate telegraph lines. Regulation of radio, primarily to assign frequencies and strength, was in 1927, but that law was repealed and its subject embodied in the 1934 Communications Act.

Back in 1913, by a letter to Attorney General McReynolds, the AT&T Company agreed to dispose of its stock in Western Union. It agreed not to acquire any independent telephone companies without approval of the Interstate Commerce Commission. It agreed to allow other telephone companies to connect to its network for toll service. The Court has not seen a copy of that letter said to be dated December 19, 1913, and if any of the parties can provide a copy, it will be useful to this history.

On July 29, 1918, during World War I in the Wilson administration, the United States took over all telephone and telegraph systems in the country and they were oper-

ated under the control of the Post Office until August 1, 1919, when they were all returned to their owners.

After its establishment in 1934, the FCC undertook an inquiry into the national communications network, and this culminated in the Walker Report of 1938.

In 1949 the present suit under Sections 1, 2 and 3 of the Sherman Act was filed in this District, ending with the final judgment of January 24, 1956.

The FCC meanwhile undertook a series of inquiries of which this Court does not have a complete list. One of these began in late 1965 as a rate inquiry into interstate and foreign service. Phase 1A, which dealt with establishing a range for rate of return was decided in June, 1967. An inquiry into rate making principles began in October, 1967.

Along other lines, in about 1955, the Hushaphone ruling concluded that provisions forbidding the attachment of devices could not be applied to acoustical devices of the kind involved which seems to have been a sound insulating cup or shield for use on the mouthpiece of a telephone in noisy locations. It is understood the Court of Appeals reversed that ruling, but not in a way that affected the principle involved.

In 1968 the Carterfone * * * decision allowed interconnection of a private two-way radio system to the telephone network through a base station. The decision struck down a tariff provision prohibiting such a connection so long as the link was through a coupling device provided by the telephone company.

As the Court understands it, the principle of that case applied to like tariffs of all telephone companies.

After that, and the Court does not have the names or dates, the FCC conducted hearings and established a program to allow direct connection without a coupler for equipment obtained by the customer so long as it was first submitted to FCC experts for test and certification and its use was compatible with the network. On that basis the make and model would be registered.

As the Court understands the way the program works, customers are free to acquire and attach registered equipment, so long as they inform the telephone company of the item attached so that circuit tests from the central offices can be conducted without being distorted.

Somewhat earlier in the MCI case, the FCC allowed competition in the field of long distance calls. As the Court understands that system, a local call is made at each end through base stations connected with the local network, while the long distance link is provided by microwave radio.

While it is not entirely clear, it would appear that the customer pays his own telephone company the applicable charge for the local call from his location to the transmitting station and the competitor pays some telephone company for the local call from the receiving base station to the called party. The caller also pays the competitor for the long distance microwave link which presumably includes the terminating charge paid by the competitor.

In any event, a series of rulings marked by Hushaphone, Carterfone, the certification and registration program and by the MCI case seem to reflect a gradual change of regulatory approach in the direction of encouraging competition with telephone companies in two major areas.

One: Evidently any manufacturer who can satisfy the certification requirements and obtain registration is free to make and sell to customers, and customers are free to connect directly to the telephone loop or PBX trunk lines any kind of terminal equipment whatsoever that is capable of transmitting communications through the network and this is without a coupler.

As the Court is aware from a motion heard last year, there will be instances where special devices must be incorporated or added to such a connection in order to achieve effective transmission of high speed data by digital signals over a network designed for analog signals. These devices are known as modems, meaning modulator and demodulator. There may be other such devices for other purposes.

Second: Competition with the long lines division of AT&T is provided by a link between local central offices for long distance calls, the long distance link being patched into the local central office at each end.

Thus, without expressing any view on the merits of the motion, the FCC decision which gave rise to the motion has the appearance of being another step taken in the same direction along that line of opening up further areas to the forces of open market competition.

If this history is substantially correct, then all of the recent history except for the Hushaphone decision has occurred since the entry of the 1956 judgment in this case. It also appears that the 1956 judgment does not purport to decide what any person who is not a party in the case may or may not do. All it seems to decide is, one, it says what the defendants may not do. Two, it requires one or another defendant to do some specified things, such as to grant patent licenses, whether the licensee exploits the license for communications purposes or for some entirely different purpose. It also requires Western, the defendant Western, to establish and maintain a system of costs of manufacture.

The parties to the case are in disagreement on the question whether action taken to comply with the recent FCC decision will conflict with the 1956 judgment. It seems appropriate to have the motion filed for this Court to construe the judgment. It appears to be settled that this can be done by an application in the cause itself. In this connection, see *New Jersey v. New York*, 296 U.S. 259 (1935), an original action in the Supreme Court of the United States, where it was called upon to carry out precisely such a function.

Also, it appears that the question can be settled by an independent suit in the same court for declaratory judgment. In this connection see *National Ben Franklin Insurance Company v. Camden Trust Company*, 21 N.J. 16 (1956), an independent declaratory judgment action to construe an earlier judgment.

To proceed in the face of the disagreement which seems to exist without first seeking construction of the judgment would be to take a needless risk. See, for example, *State ex rel Jarboe v. Holt*, 444 S.W.2d 857 (Sup.Mo.1969 en banc), and *Lucky Calendar v. Cohen*, 19 N.J. 395 (1955), also, 20 N.J. 160 (1955) as well.  * * *

