ILLINOIS TELEPHONE CORPORATION *et al.*, Appellants, v. ILLINOIS
COMMERCE COMMISSION *et al.*, Appellees.

First District (2nd Division)   No. 1—90—2370

Opinion filed March 29, 1994.

O'Keefe, Ashenden, Lyons & Ward, of Chicago (Michael W. Ward, John
F. Ward, Jr., and Henry T. Kelly, of counsel), for petitioners.

Amy S. Botschner, Special Assistant Attorney General, of Chicago, for
respondent Illinois Commerce Commission.

Rick D. Bailey and Dennis S. Pines, both of AT&T Communications of Illinois, Inc., of Chicago, for respondent AT&T Communications of Illinois, Inc.

Edward A. Butts, Louise Sunderland, and Patricia E. Bergum, all of Illinois Bell Telephone Company, of Chicago, for respondent Illinois Bell Telephone Company.

JUSTICE McCORMICK delivered the opinion of the court:

The petitioners, Illinois Telephone Corporation and Darryl Henry, one of its officers (collectively, ITC), petition for review of an order of the Illinois Commerce Commission (the Commission), which found that ITC failed to prove, by a preponderance of the evidence, that certain direct-dialed international calls were not made through its pay telephones but rather, as ITC alleged, through an illegal tap on respondent Illinois Bell's (Bell) telephone lines. On review of the Commission's decision, ITC argues (1) that the Commission erred in allowing Bell to disconnect local phone service to ITC when ITC had a genuine dispute with AT&T Communications of Illinois (AT&T) about the international charges; (2) that the Commission erred in its application of the burden of proof; (3) that the Commission erred in dismissing AT&T as a party to the action for lack of subject matter jurisdiction; and (4) that the Commission's decision was against the manifest weight of the evidence. We affirm the order of the Commission.

In September 1986, ITC installed two customer-owned pay telephones at a service station on South Halsted Street in Chicago. ITC introduced a series of bills for service to the two lines covering a period from September 1, 1986, through May 1, 1987. The November 1, 1986, bill charged ITC for several direct-dialed international calls, made during the preceding month on 29 separate occasions to Mexico, Israel and Jordan. This calling pattern continued for a period of five months, with the most frequent calling occurring during the daytime or early evening. The calls ceased after January 1987.

On May 18, 1987, Darryl Henry, on behalf of ITC, filed a complaint with the Commission against AT&T. In February of 1988, ITC was granted leave to join Bell as a party. The complaint alleged that the direct-dialed international calls, totalling approximately $2,211, were improperly charged to the ITC pay telephones. The long-distance charges were billed to ITC by Bell as billing agent for AT&T.

A hearing on ITC's complaint was held on February 3, 1988. Henry testified that his company purchased the pay telephones from TOTALCOMMUNICATION Services, Inc. (TOTALCOM). According

to TOTALCOM's distributor, Martin Segal, the telephones included software that was designed to prevent direct-dialed international telephone calls. Henry first contacted AT&T in November about the fraudulent international calls and was told he would be issued credit for the calls. The credit, however, was not issued. Henry also informed Bell about the fraudulent calls. Bell sent an inspector to check on its equipment; he found no evidence of tampering. Henry, himself, also went to the site at 3047 South Halsted to inspect the telephones, Bell's access lines and interface boxes during the period of fraudulent calling. He, too, found no evidence of tampering. The software circuitry in these pay telephones was not tested during the months of fraudulent calling.

Segal, vice-president of TOTALCOM, the distributor of the telephones used by ITC, testified that the telephones installed at the service station were Intellical Model 2001, equipped with version 159 software. According to Segal, version 159 software was designed to block direct-dialed international calls. Segal surmised that an individual could make direct-dialed international calls by gaining access to Bell's interface.

Segal also testified that he inspected the telephones in October 1987, several months after the fraudulent calls ceased. At the time Segal inspected the pay telephones, the software system had been upgraded to software version 160. The upgraded software was also designed to block direct-dialed international calls. Segal testified that previous pay telephones equipped with the version 159 software might have been "more susceptible" to direct-dialed international calls.

Jim Welter, director to technical services for TOTALCOM, also testified that the version 159 software installed in the pay telephones at the time of the fraudulent calling was incapable of completing direct-dialed international calls. This fact notwithstanding, Welter stated that such software was not foolproof.

Fred Gewalt, computer operations manager and security representative for Bell, testified that he found no evidence of tampering when he examined Bell's equipment. His examination included Bell's wiring and interface boxes. However, Gewalt, like Segal, conducted his investigation in October of 1987, several months after the fraudulent calling ceased. An employee of Bell since 1959, Gewalt stated that in his experience as an investigator for Bell, every case of alleged tampering was accompanied by some evidence of tampering with Bell's lines or interface boxes. In this case, Gewalt testified, he found none.

Gewalt also explained that an individual could gain access to

Bell's network and place a direct-dialed international call by accessing Bell's interface boxes. However, the interface boxes connected to the pay telephones in question were located 10 feet above the ground at the intersection of a busy street. Any type of access to the interface boxes would require the use of a ladder. Gewalt further explained that if the calls had been made daily for several months during the winter, he would expect to see scratch marks or other physical evidence of repeated opening and closing of the interface boxes.

The Commission dismissed the complaint with respect to AT&T, finding that it lacked jurisdiction to adjudicate the validity of the international toll charges because such disputes were under the authority of the Federal Communications Commission (FCC). The Commission determined that its jurisdictional basis to review ITC's complaint was limited to the issues involving Bell's local exchange services and the security of Bell's exchange system.

The Commission determined that while the evidence suggested that the fraudulent calls were not completed on ITC's telephones the evidence also showed that there was no tampering with Illinois Bell's equipment. Thus, the Commission concluded that the probable source of the international calls was indeterminate and found that ITC failed to establish, by a preponderance of the evidence, that the fraudulent international calls attributed to ITC's telephones were not made through its telephones "since no evidence exists as to how the fraudulent calls were made."

■ ITC argues in its petition for review before this court that the Commission erred in dismissing AT&T as a party to its action with Bell. ITC contends that AT&T was a necessary party to its action and that, because AT&T filed an appearance before the Commission, it submitted itself to the Commission's jurisdiction.

ITC's contention is based on its erroneous assumption that AT&T's filing of an appearance before the Commission gave the Commission subject matter jurisdiction over ITC's billing dispute with AT&T. However, the Federal Communications Act of 1934 has given the Federal Communications Commission (FCC) exclusive authority to regulate interstate and international communication. (47 U.S.C. § 152(a) (1982).) This exclusive authority extends to interstate and foreign commerce in wire and radio communications and plenary jurisdiction over charges for such communications. (47 U.S.C. § 151 (1982)); *United States v. Western Electric* (1981), 531 F. Supp. 894, 903.

ITC's dispute with AT&T involved international tariffs that are wholly outside of the Commission's jurisdiction. ITC's complaint

against AT&T requested the Commission adjudicate "false charges on COPTS lines for international calls," and characterized its action as a "billing dispute" with AT&T. Since the Commission has no authority to resolve disputes over international tariffs, the Commission correctly held that it did not have jurisdiction to adjudicate ITC's billing dispute with AT&T. Furthermore, the Commission's decision addressed only the question of Illinois Bell's equipment and services and, thus, AT&T as the long-distance carrier was not a necessary party to that determination.

■ ITC's next contention is that Bell unreasonably terminated service to ITC based on the unpaid disputed charges with AT&T. ITC did not argue the reasonableness of Bell's disconnection procedures or challenge Bell's authority to do so during its litigation before the Commission. Failure to raise an issue before an administrative body waives the issue for review in this court. *Illinois Bell Telephone Co. v. Human Rights Comm'n* (1989), 190 Ill. App. 3d 1036, 1044-45, 547 N.E.2d 499.

Even assuming, *arguendo*, that this issue had been properly preserved for review, ITC's contention is without merit. Indeed, this court has read the Commission's order and has found no finding by the Commission authorizing Bell to terminate service to ITC. The Commission's order in this case is limited to "its authority over Respondent Illinois Bell's local exchange network and issues relative to exchange services and the security of Illinois Bell's exchange system." In that regard, the evidence sought to determine whether Bell's equipment, rather than ITC's, could have been responsible for the fraudulent calls charged to ITC. ITC raised no factual issues regarding Bell's billing practices or procedures, and, except for Darryl Henry's testimony on cross-examination that Bell informed him that any determination with respect to termination of service was being held pending the outcome of this litigation, there was no evidence of termination of service whatsoever.

■ ITC's third contention is that the Commission's decision is against the manifest weight of the evidence. Specifically, ITC argues finding No. 6 of the Commission, that "[c]omplainant has not sustained his burden of proof as to his allegation that the international calls billed to the lines in question were not completed through [its] telephone equipment," was erroneous.

The Commission's findings on questions of fact are *prima facie* true and correct. (*Moncada v. Illinois Commerce Comm'n* (1991), 212 Ill. App. 3d 1046, 1051, 571 N.E.2d 1004.) The Commission's orders are to be deemed *prima facie* reasonable and a reviewing court may only reverse an order of the Commission if said order is not supported

by substantial evidence. (*Moncada*, 212 Ill. App. 3d at 1051-52.) Moreover, the party challenging the order has the burden of proving that the Commission's order was erroneous. *Moncada*, 212 Ill. App. 3d at 1052.

The Commission here had substantial evidence from which to conclude that ITC failed to sustain its burden of showing that the fraudulent international calls, the fact of which was never in dispute, were made due to tampering with Bell's communication equipment rather than through ITC's pay telephone equipment.

Darryl Henry testified that the Intellical Model 2001 telephones were programmed with computer software designed to block direct-dialed international calls. However, Jim Welter, a technician at TOTALCOM, testified that such software was not "foolproof." Welter did not personally test the software during the period of fraudulent calling and, in fact, at no time was the software circuitry tested during that time. Moreover, Henry testified that he, himself, inspected the telephones and Bell's equipment and found no evidence of tampering. Henry's testimony corresponded to that given by Fred Gewalt, Bell's security representative, who stated that he found no evidence of tampering during his inspection, albeit that Gewalt's inspection took place several months after the fraudulent calling ceased.

Finally, the evidence showed that although it was possible to breach Bell's network interface to make direct-dial long distance calls, we agree with the Commission that such a proposition is "somewhat unwieldy" in light of the fact that the interface boxes were located 10 feet above the ground, near a busy intersection, and since the calls were made in the daytime and early evening hours when it would be unlikely for anyone accessing the interface boxes from such a location to have gone unobserved. In light of the foregoing, we cannot say that the Commission erred in finding that ITC failed to sustain its burden of proof that the fraudulent calls were not made through its telephone equipment.

Affirmed.

DiVITO, P.J., and HARTMAN, J., concur.