658 N.E.2d 1301 (1995)
276 Ill.App.3d 672
213 Ill.Dec. 280
S.W., Plaintiff-Appellant,
v.
The DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al., Defendants-Appellees.
No. 1-94-2375.
Appellate Court of Illinois, First District, Third Division.
December 6, 1995.
*1302 Ryan, Miller & Trafelet, P.C., Chicago (Catherine M. Ryan, of counsel), for appellant.
James E. Ryan, Attorney General, Chicago (Barbara A. Preiner, Solicitor General, Mary E. Welsh, of counsel), for appellees.
Presiding Justice GREIMAN delivered the opinion of the court:
Plaintiff S.W. appeals the circuit court's order which affirmed the final administrative decision of defendant Illinois Department of Children and Family Services (DCFS) denying his request to expunge an indicated finding of sexual molestation involving a four-year-old girl.
On appeal plaintiff raises two issues: (1) whether plaintiff was denied his constitutional right to due process of law by reason of defendant's failure to comply with certain statutory and regulatory time limitations; *1303 and (2) whether defendant's findings were against the manifest weight of the evidence or contrary to law.
We find that the delay in the proceedings did not violate plaintiff's constitutional due process right and that the evidence sufficiently supports the administrative agency's decision. Accordingly, we affirm the circuit court's order.
Mr. and Mrs. C. married in June 1984 and had one child named J.C. who was born in June 1987. In June 1989, Mrs. C. filed for a divorce and in September 1989, met plaintiff and they then began dating.
In February 1990, while the divorce was still pending, Mr. C. reported Mrs. C. to DCFS for suspected abuse and neglect of J.C. (referred to as case no. 371670-A). By letter dated March 16, 1990, DCFS notified Mrs. C. that after a thorough evaluation, the report was determined to be unfounded.
In March 1990 Mr. C. reported plaintiff to DCFS for alleged abuse of J.C. (case no. 371670-B). Plaintiff was alleged to have chased J.C. "around the house and was kicking her." In February 1990 plaintiff had a large tumor removed from his spine and the allegation of chasing J.C. occurred within two weeks of plaintiff's surgery. Since it was difficult for plaintiff to "just stand up" himself, it was doubtful that he had the ability to chase anyone "around the house." By letter of April 5, 1990, DCFS acknowledged this report to be unfounded.
Sometime in March 1991, Mrs. C. and her daughter J.C. moved into plaintiff's house. On March 30, 1991, Mr. and Mrs. C.'s divorce became final.
In September 1991, after the divorce was final and Mrs. C. was awarded custody of J.C., Mr. C. again reported plaintiff to DCFS concerning a bruise on J.C.'s head (case no. 371670-C). According to plaintiff, J.C.'s bruise resulted from an accidental fall. While J.C. was eating lunch, she stood on a swivel chair with wheels and reached over when plaintiff pushed on the swivel chair causing J.C. to hit her head on "a plastic Kool-Aid cup." A few days later, on Wednesday, Mr. C. picked up J.C. for visitation, noticed the bruise on her head, and reported plaintiff for child abuse claiming that plaintiff had struck J.C. in the head with a bottle. Due to the nature of the allegation, Mr. C. was given custody of J.C. for the next four days. Following an investigation, DCFS issued an "indicated" finding in the case. An indicated finding means that credible evidence has been found that child abuse occurred. Plaintiff asked his attorney to appeal the case but his attorney failed to pursue the appeal and the time period allowed for an appeal expired.
In September 1991, Mr. C. filed a petition seeking custody of J.C.
The events surrounding the instant case began on October 30, 1991 (Wednesday), when J.C. misbehaved at the day care center she attended and told her teacher (Janice Herr) that plaintiff "gets home and makes me stand in the corner until night time and I don't get Teddie and I don't get dinner and he makes me sleep there." The day care center teacher and teacher's aide (Tammy Ostrand) prepared a report containing this information and directed the report to the assistant director of the day care center (Sophia Terenzio) who in turn notified DCFS. The next day, October 31, 1991 (Thursday), Richard Zemon, a child protection investigator from DCFS, was assigned the case regarding possible improper physical punishment by plaintiff of J.C., i.e., standing in the corner all night without dinner.
On November 1, 1991, (Friday), Zemon went to the day care center to investigate the allegation of improper physical punishment of J.C. and food deprivation at home by plaintiff. Zemon first met with assistant director Terenzio and reviewed the report written by J.C.'s teacher and teacher's aide.
Immediately after meeting with the assistant director and reviewing the teacher's report, Zemon met with J.C. in the office of the assistant director. Zemon noted that the assistant director, the director (Lorri Fabry) and the teacher (Janice Herr) were also present. In his report Zemon noted the time as 11:15 a.m. and stated:
"Child appeared healthy and well cared for. Child was reluctant to talk with me or to answer my questions. Finally asked *1304 teacher to go over statements (child's back was toward me during this). Child did not confirm standing in corner and not getting `Teddie' but stated that she eats when she comes out of the corner. Said she does not eat while she is in the corner. It was also obvious from the discussion that child has no concept of time yet."
Zemon testified at the administrative hearing that he believed "there really was no substance" to the allegation that J.C. had been required to stand in the corner all night without dinner.
After the 11:15 a.m. discussion, J.C. returned to the classroom and the director raised the instant sexual abuse claim with Zemon. In his report, Zemon stated that he was then informed by the director that on October 30, 1991 (Wednesday) J.C.
"volunteered to teacher and aide that [plaintiff] `sleeps with me.' Child went on to tell them that `sometimes he wears clothes.' When asked whether [plaintiff] makes her touch anything, child `appeared scared at first, then said yes.' Child went on to tell them that plaintiff `lays his tummy on my tummy and one time stuff came out; it was white; he calls it chicken.' Child also said to them `He calls his private parts his tummy but it's not his tummy.' Child also told them he sometimes touches her private parts. Child also told them that [plaintiff] calls her `a bad word' and reluctantly told them the word was `bitch.' Said that he calls her that `a lot.'"
Immediately after being advised about this information, J.C.
"was brought back into the office and the same interview technique described above was used again and child reaffirmed all of those statements. Since mother was due shortly to pick up child, I [Zemon] decided to wait and talk to her."
Mrs. C. arrived at day care and met with Zemon at 12:15 p.m. When Zemon informed Mrs. C. about plaintiff's alleged sexual behavior, she "was shocked" and "could not believe it." According to Zemon, Mrs. C. said that "she and her former husband are in the middle of a bitter custody battle and speculated that he might have coached her to say these things."
Next, Zemon noted in his report that
"[J.C.] was brought back into office and again teacher reviewed the statements with her and child reaffirmed them (her back was toward mother). After, mother asked minor what she felt when [plaintiff] lay his tummy against hers; was it skin or clothing or a blanket? Child said she felt skin."
Zemon next noted in his report that after J.C. left the room, Mrs. C.
"speculated that the natural father might have coached the child to say these things. [Zemon] asked mother whether she really believed the child could be coached into making those statements and mother agreed that it was probably not possible."
Zemon decided that Mrs. C. "would be extremely protective of minor at this time and decided against removing minor." Zemon was not aware that Mr. C's attorney had telephoned the day care center on October 30 to ask whether J.C. had made any allegations of sexual abuse and did not recall whether Mr. C. had been at the school on October 31.
After leaving the day care center, Mrs. C. took J.C. home and called her attorney who in turn called plaintiff. At home, Mrs. C. told plaintiff about the allegations. Plaintiff already was aware of the allegations because his lawyer had called and informed him at work. Mrs. C. testified that plaintiff was very surprised, shocked and hurt by the allegations and thought "how could her dad get her to say these things about me?" Mrs. C. testified that plaintiff and she talked about the allegations with J.C. and J.C. denied it. J.C. left that same night (November 1, Friday) about 8 p.m. to spend the weekend with Mr. C. as part of the regularly scheduled visitation.
On November 4, 1991, (Monday), Mrs. C. left plaintiff's house and moved into her mother's residence. Plaintiff and Mrs. C. cancelled their wedding plans and are currently still living apart.
On November 4, 1991, Zemon contacted the local police department and arranged an interview for J.C. with the Children's Advocacy *1305 Center. To determine whether he should indicate possible abuse, Zemon was required to have someone other than himself conduct an interview with the child and he chose the center.
On November 8, 1991, Erin Sorenson, the executive director of the Children's Advocacy Center, interviewed J.C. While Sorenson interviewed J.C. in a room alone, Zemon, an assistant State's Attorney and a police detective viewed the interview through a one-way glass window. The attorney and detective were present to determine whether they could file criminal charges. Sorenson testified that although a parent is sometimes allowed to watch the interview, Mrs. C. was not permitted to observe the interview because a child may be deterred from "talking in a truthful and upfront manner" when a child has knowledge that a parent is observing the interview.
Sorenson's interview with J.C. lasted about 45 minutes and included three breaks because J.C. "was very anxious, wanting to see her mother, wanting to see her grandmother." Sorenson testified that three breaks for a child of age four is "unusual" and that throughout the interview, J.C. "was very distracted," and "made very little eye contact, looking down, anxious to leave."
Sorenson testified that during the interview, J.C. was not able to answer anything other than yes or no questions in a consistent manner. Using doll house figure dolls, J.C. was able to identify "all of the major body parts correctly and she identified her genitalia on the female doll as a pee-pee and the breasts as boobies and on the male doll she identified the genitalia as a peesure." J.C. stated that she lived with her mommy, daddy and ga-ga, referring to her grandmother. When Sorenson asked J.C. if she was afraid of anyone she knew, J.C. said no. When Sorenson asked J.C. if she was afraid of specifically named persons (i.e., mother, father, ga-ga and plaintiff), J.C. answered no but as to plaintiff, J.C. commented that she's afraid of him when he hits her. When asked whether or not plaintiff had given her a bad touch, J.C. answered no.
Sorenson usually asks open-ended questions. After the third break in her interview with J.C., however, Zemon instructed Sorenson to be more direct in her questioning and Sorenson complied.
After the third break, Sorenson asked J.C. direct questions about what she had told a teacher and J.C. "contradicted some of the things that she had answered to" Sorenson's less direct questions. The third and last period of questioning is specifically recounted in a written report authored by Sorenson and entitled "Interview Summary." The report states
"Because [J.C.] had allegedly made a disclosure to her preschool teacher which was not being confirmed in this interview in a non-leading manner, direct questions were asked of [J.C.] before the interview was concluded.
Interviewer: Do you remember talking to Miss Jay about [plaintiff]?
[J.C.]: No.
I: Did you tell Miss Jay that [plaintiff] sleeps with you?
J: Yes.
I: When I asked you before if [plaintiff] slept with you, you said no.
J: I didn't know that's what you meant.
I: Does [plaintiff] sleep with you?
J: Yes.
I: Can you show me with the dolls how [plaintiff] sleeps with you?
J: No.
I: (Interviewer arranges dolls in every sort of position in the bed asking [J.C.] after each position `Does he sleep like this?'.)
J: ([J.C.] nods her head `yes' after each position is shown to her.) I: How does it feel when [plaintiff] sleeps with you?
J: Bad, I can't hardly breathe.
I: When [plaintiff] sleeps with you, are his clothes on or off?
J: He wears a pajama top.
I: Does he wear bottoms?
J: No. (She again grows very anxious and states that she want[s] to go by Gaga and read a story.)
I: J.C., did anyone tell you not to tell me something?

*1306 J: Yes, [plaintiff].
I: What did [plaintiff] tell you?
J: I can't tell.
I: What will happen if you tell?
J: I don't know.
Interview ended shortly after, as it was felt that [J.C.] was too anxious to proceed."
Prior to interviewing J.C., Sorenson was not aware of all circumstances leading up to J.C.'s allegation at the day care center. Sorenson explained that her "role would not have been to have been made aware of lots of background information where the advocate would have known. * * * I, myself, as an interviewer try to have as little background knowledge of a case going into it as possible."
Plaintiff denied that he ever sexually abused J.C. He testified that during his morning routine he would get dressed and be ready to go to work about 5 a.m. Sometimes plaintiff would then go into J.C.'s room to talk to her, would sit on her bed and rub her back by her shoulders. If J.C. was sleeping on her back, plaintiff would rub her stomach. Plaintiff denied ever touching J.C. in any genital area or her breasts or lying down in bed with her.
Plaintiff also testified that he had quit drinking a couple months before the alleged incident and had attended about three alcoholics anonymous meetings with a friend.
On January 17, 1992, DCFS officially informed plaintiff that a report of child abuse was indicated. The letter further informed plaintiff of his right to request an appeal.
On March 2, 1992, and March 12, 1992, plaintiff requested, through two different attorneys, that DCFS amend its records to show that the abuse report is unfounded or expunge the records of any charges of abuse. In addition, plaintiff requested a copy of the entire investigation report. Plaintiff's second request of March 12 occurred because plaintiff had secured other legal representation. On March 27, 1992, and April 2, 1992, DCFS responded to each attorney separately and forwarded materials to them on the appeal process.
On July 18, 1992, plaintiff advised DCFS that he had received a computerized form regarding information contained in the files of the State Central Register and again requested that the narrative materials be sent. On August 6, 1992, DCFS sent its investigative file to plaintiff.
On November 17, 1992, DCFS notified plaintiff that it denied his request for expungement after reviewing the record and plaintiff's response to that record.
On November 27, 1992, plaintiff requested a hearing to appeal the indicated finding and unedited copies of DCFS' records in the matter. On December 24, 1992, DCFS notified plaintiff that an administrative hearing could not be scheduled for several months "[d]ue to the numerous requests for administrative hearings that [DCFS] receives."
By letter dated April 14, 1993, DCFS notified plaintiff that a hearing was scheduled for May 11, 1993. Before receiving this notice from DCFS, plaintiff renewed his request for a hearing by letter dated April 16, 1993. On April 23, 1993, plaintiff requested an opportunity to examine documents in DCFS' file on this matter. At the request of DCFS, the May 11 hearing date was rescheduled for May 28, 1993.
On May 28, 1993, a hearing was held before Administrative Law Judge Ann Breen-Greco (ALJ). On July 30, 1993, the ALJ issued a 25-page opinion recommending that plaintiff's request for expungement be denied. On August 13, 1993, the director of DCFS concurred with the ALJ's recommendation that plaintiff's report remain indicated. The director's decision constitutes the final administrative decision for purposes of appeal.
On September 17, 1993, plaintiff filed a complaint for judicial review of the administrative decision. On June 21, 1994, the circuit court held a hearing on plaintiff's complaint, heard the arguments of counsels and affirmed the decision of DCFS. On July 12, 1994, plaintiff filed a timely notice of appeal.
On appeal, plaintiff first asserts that he was denied his constitutional right to due process of law because DCFS failed to comply with the applicable time limits established by statute and departmental regulations regarding administrative hearings. *1307 Based on DCFS' deviation from the time limits, plaintiff argues that the lengthy delay in his appeal process was unreasonable and, as a result of the delay, was deprived of the fundamental fairness which due process requires.
DCFS contends that plaintiff waived the due process issue because he failed to raise it at the administrative level and instead waited until the circuit court proceedings. On the merits, DCFS does not deny that applicable time limitations were exceeded but contends that the noncompliance was not so unreasonable as to constitute a due process violation.
"Failure to raise an issue before an administrative body waives the issue for review in this court." (Illinois Telephone Corp. v. Illinois Commerce Comm'n (1994), 260 Ill.App.3d 919, 923, 198 Ill.Dec. 151, 632 N.E.2d 210; Wallace v. Human Rights Comm'n (1994), 261 Ill.App.3d 564, 569, 199 Ill.Dec. 55, 633 N.E.2d 851.) The waiver rule applies equally to issues involving constitutional due process rights. (Smith v. Department of Professional Regulation (1990), 202 Ill.App.3d 279, 287, 147 Ill.Dec. 544, 559 N.E.2d 884.) Raising an issue for the first time in the circuit court is unavailing because "[t]he waiver rule specifically requires first raising an issue before the administrative tribunal rendering a decision from which an appeal is taken to the courts." Smith, 202 Ill.App.3d at 287, 147 Ill.Dec. 544, 559 N.E.2d 884.
Even assuming, arguendo, that the due process issue was not waived, the delays in the present case were sufficiently reasonable to avoid finding that the proceedings were constitutionally deficient. The time frames applicable to handling and reviewing a case of child abuse and neglect by DCFS are established by statute in the Abused and Neglected Child Reporting Act (325 ILCS 5/1 et seq. (West 1993)) (hereinafter the Act) and promulgated by rules in the Illinois Administrative Code (89 Ill.Adm.Code § 309.1 et seq. (1989) (the review and appeal process for DCFS)) (hereinafter the Code).
Section 7.16 of the Act provides that the subject of an indicated finding "shall have the right to a hearing within the Department" and "[s]uch hearing shall be held within a reasonable time after the subject's request." (325 ILCS 5/7.16 (West 1993).) Following a hearing, a written "decision shall be made * * * within 30 days thereof." 325 ILCS 5/7.16 (West 1993).
The Code provides a two-step appeal process whereby an administrative office first reviews the original decision. (89 Ill.Adm. Code § 309.9 (West 1989) (an appeal request "begins a two step appeal process"); 89 Ill. Adm.Code § 309.13 (West 1989) (the regional office decides whether to affirm, modify or reverse the original decision).) Following this initial review, "a formal appeal hearing may be requested" by the appellant (89 Ill. Adm.Code § 309.14 (1989)) and where, as in the present case, the subject makes such request, the administrator is directed to "schedule the hearing at a date within 30 calendar days" of the request. 89 Ill.Adm. Code § 309.16(a) (1989).
The time frames established for the administrative hearing are directory, not mandatory. Shawgo v. Department of Children & Family Services (1989), 182 Ill. App.3d 485, 488-90, 131 Ill.Dec. 46, 538 N.E.2d 234; see Stull v. Department of Children & Family Services (1992), 239 Ill. App.3d 325, 334, 179 Ill.Dec. 954, 606 N.E.2d 786 (whether deemed mandatory or directory, the time limitations in the Act and the Code represent a reasonable length of time in which the agency must act).
DCFS concedes that time periods established in the Act and the Code were exceeded. However, when DCFS fails to comply with established time periods, mandamus is the proper remedy to seek. (Shawgo, 182 Ill.App.3d at 490, 131 Ill.Dec. 46, 538 N.E.2d 234.) Plaintiff in the present case, however, did not seek such relief and instead acquiesced throughout the proceedings.
Moreover, the regulations in the Code are directory and a standard of reasonableness is articulated in section 7.16 of the Act for the time of an administrative hearing. After plaintiff requested a hearing in November 1992, the hearing was held six months later (May 1993), the ALJ entered its opinion *1308 within two months (July 1993), and the final administrative decision followed two weeks later (August 13, 1993). Due process requires that a hearing be held "at a meaningful time," not within a particular time frame. (Gunia v. Cook County Sheriff's Merit Board (1991), 211 Ill.App.3d 761, 768, 156 Ill.Dec. 177, 570 N.E.2d 653, citing Cleveland Board of Education v. Loudermill (1985), 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494, 507.) In Gunia, this court found no due process violation where a nearly five-month delay (147 days) elapsed before a hearing was held. (Gunia, 211 Ill.App.3d at 769, 156 Ill.Dec. 177, 570 N.E.2d 653.) In Loudermill, the United States Supreme Court found no constitutional due process violation where nine months passed between the filing of an administrative appeal and the disposition of the appeal. (Loudermill, 470 U.S. at 546-47, 105 S.Ct. at 1495-96.) Under the circumstances and chronology of this case, we do not believe that the delay constitutes a violation of plaintiff's due process rights.
Second, plaintiff asserts that the ALJ's decision was against the manifest weight of the evidence and its findings were contrary to law. Plaintiff particularly argues that J.C.'s statements were contradictory and did not meet the criteria for admissibility as reliable or credible evidence. Plaintiff also argues that J.C.'s statements contained terminology not credible for a four-year-old child and her father had a motive to coach her to fabricate statements.
Plaintiff acknowledges that the findings and conclusions of an administrative agency on questions of fact are held to be prima facie true and correct. 735 ILCS 5/3-110 (West 1992).
In reviewing an administrative agency's decision, our role is restricted to ascertaining "whether the findings and decisions of the agency are against the manifest weight of the evidence." (Abrahamson v. Illinois Department of Professional Regulation (1992), 153 Ill.2d 76, 88, 180 Ill.Dec. 34, 606 N.E.2d 1111.) "[O]nly if the opposite conclusion is clearly evident" is the agency's decision against the manifest weight of the evidence. (Abrahamson, 153 Ill.2d at 88, 180 Ill.Dec. 34, 606 N.E.2d 1111.) "If there is anything in the record which fairly supports the agency's decision, such decision is not against the manifest weight of the evidence and must be sustained upon review." (Christiansen v. Edgar (1991), 209 Ill.App.3d 36, 43, 153 Ill.Dec. 738, 567 N.E.2d 696.) To find an agency's decision against the manifest weight of the evidence, the court must determine, after viewing the evidence in the light most favorable to the agency, that no rational trier of fact could have agreed with the agency's decision. Christiansen, 209 Ill.App.3d at 43, 153 Ill.Dec. 738, 567 N.E.2d 696.
We cannot substitute our judgment for that of the administrative agency and we cannot reverse the administrative findings based on the "mere fact that an opposite conclusion is reasonable or that [we] might have ruled differently." (Abrahamson, 153 Ill.2d at 88, 180 Ill.Dec. 34, 606 N.E.2d 1111.) Moreover, neither "this court nor the circuit court can reweigh the evidence or the determination of the credibility of the witnesses, which is to be made by the agency." Doe v. Department of Children & Family Services (1994), 265 Ill.App.3d 907, 911, 203 Ill.Dec. 110, 639 N.E.2d 149.
Plaintiff most notably attacks J.C.'s statements as hearsay but does not challenge their admissibility. Instead plaintiff challenges the ALJ's decision to consider some of J.C.'s contradictory statements as credible while disregarding other such statements. Plaintiff admits that there is no case law discussing the admissibility of hearsay statements of child victims of sexual abuse during administrative proceedings but urges this court to consider case law on that issue in civil and criminal proceedings.
"It is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect." (Jackson v. Board of Review of Department of Labor (1985), 105 Ill.2d 501, 508, 86 Ill.Dec. 500, 475 N.E.2d 879.) In an administrative proceeding, "hearsay evidence that is admitted without objection may be considered by the administrative body and by the courts on review." (Jackson, 105 Ill.2d at 509, 86 Ill.Dec. 500, 475 N.E.2d 879.) When unobjected-to hearsay *1309 statements are before the factfinder, it is "his prerogative to give those statements whatever weight he thought they should be given." Jackson, 105 Ill.2d at 509, 86 Ill.Dec. 500, 475 N.E.2d 879.
Applying these principles to the instant case, we find that the agency's decision must stand. Plaintiff focuses on the lack of medical evidence and speculations about J.C.'s father's motive to coach her. The ALJ specifically addressed and rejected the arguments now presented by plaintiff. As to the lack of medical evidence, the ALJ explained that this case did not allege penetration but rather sexual molestation.
Regarding J.C.'s father's motive and the terminology used by J.C., the ALJ stated:
"The contentions raised by the appellant about the divorce proceeding, motive of the ex-husband, and the child's alleged retraction are not evidence but merely factors for the administrative law judge to consider. She has considered these factors and makes the determination there is credible evidence of the child's statements in ageappropriate words as told to her day care teacher and to the victim-sensitive interviewer, Erin Sorenson, that the appellant sexually abused [J.C.]."
Based on the evidence admitted and the deference accorded a decision entered by an administrative agency, we cannot say that a conclusion opposite to the agency's decision is clearly evident to justify reversal even if the ALJ could have, and even if a reviewing court would have, reached a different result. "If the record contains evidence to support the agency's decision, it should be affirmed." Abrahamson, 153 Ill.2d at 88, 180 Ill.Dec. 34, 606 N.E.2d 1111.
We are mindful that whenever a court excuses governmental agencies from adhering to a time table we are, in effect, ignoring the mandate of the General Assembly and encouraging the agency to ignore the prescription of the established time limits. However, here we are faced with competing policies: the protection of children from abuse and the unwarranted stigma of being a child abuser. However, for all the foregoing reasons, we affirm the circuit court's order.
Affirmed.
TULLY and CERDA, JJ., concur.